UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

Peggy Jackson, Philip Jackson, Sr.,          )
Phillip Jackson, Jr., Noah Jackson,          )
Alexandria Jackson, and Nicholas Jackson,    )
                              Plaintiffs     )
                                             )
                                             )         Case No. 02-4089
                                             )
The City of Moline and its                   )
individually named police officers;          )
The Village of Milan and its                 )
individually named police officers;          )
Steve Zemo and Rebecca Zemo;                 )
and Marshall E. Douglas, Esq.,               )
                              Defendants     )

**ORDER**

The parties have consented to have this case heard to judgment by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and the District Judge has referred the case to me.  Now before the court are the motions for summary judgment filed by the City of Moline and its police officers (#214); the Village of Milan and its police officers (#212) and the Zemo's (#216).  Also before the court is the Motion to Strike (#224) filed by defendant Village of Milan and its employees. The motions are fully briefed and I have carefully considered the arguments and evidence.  For the following reasons, the motion to strike (#224) is granted in part and denied in part and all 3 motions for summary judgment (#212, 214, 216) are granted.

**MOTION TO STRIKE**

In this motion, defendants Village of Milan and its employees move to strike portions of plaintiffs' response to the motions for summary judgment.  The motion attacks both the

response itself and certain portions of the evidence that is submitted in support of the response.  It is granted in part and denied in part, as follows.

The first general argument made by Defendants is that certain portions of the evidence submitted in support of the response are hearsay.  Fed.R.Evid. 801 defines hearsay as a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Fed.R.Evid. 802 makes hearsay statements inadmissible.  Fed.R.Evid. 803 excludes certain types of statements from the definition of hearsay.  Hearsay, as is the case with other inadmissible evidence, cannot be used to support or resist a motion for summary judgment. Fed.R.Civ.P. 56(e).  See, also, <u>Davis v. G.N. Mortg. Corp.</u>, 396 F.3d 869, 874 (7th Cir. 2005).

The second argument raised by Defendants is that certain statements contained in the affidavits and/or arguments of the Plaintiffs are not based on personal knowledge or are speculation about matters remote from first-hand experience.  Such statements would not be properly contained in affidavits under Fed.R.Civ.P. 56(e), which expressly provides that affidavits "shall be made on personal knowledge... setting forth such facts as would be admissible in evidence, and ... showing affirmatively that the affiant is competent to testify to the matters stated therein."  See, <u>Visser v. Packer Eng'g Assocs., Inc.</u>, 924 F.2d 655, 659 (7th Cir. 1991)(inferences and opinions must be grounded in first hand experience); <u>Toro Co. v. Krouse, Kern & Co.</u>, 827 F.2d 155, 162-63 (7th Cir. 1987)(affidavits may not contain statements based on information and belief).

Some of the challenged statements are racial epithets hurled at the Jacksons by non-parties, as recounted by the Jacksons.  The statements are offered by the Jacksons

2

to show that the statements were made, not for the truth of what was said. Such statements do not fall within the definition of hearsay, so testimony about overtly racist statements actually heard by one of the Jacksons is admissible. See, <u>Anderson v. U.S.</u>, 417 U.S. 211, 219-20 (1974); <u>Emich Motors Corp. v. General Motors Corp.</u>, 181 F.2d 70 (7th Cir. 1950), rev'd on other grounds, 340 U.S. 558.

However, other statements are more problematic. For example, in Noah Jackson's affidavit, he affirms that, after he saw and heard Jared Zemo and two other boys yelling racial epithets, one of the two other boys told him not to be concerned with Jared Zemo because Jared was being "stupid and crazy." According to Plaintiffs, that statement is not offered for its truth but rather is offered as "context," to explain why Noah did what he did on that evening. All relevant evidence provides context, <u>U.S. v. Bowie</u>, 232 F.3d 923, 928-29, (D.C. Cir. 2000) however, and "context" is not one of the exceptions to hearsay. See, <u>U.S. v. Stover</u>, 329 F.3d 859, 870 (D.C.Cir. 2003). Moreover, this particular statement is wholly unrelated to why Noah's mother called the police, so even if it were not hearsay, it would be inadmissible as irrelevant.

Similarly, Noah's affidavit recounts what one of the other boys said to the Jacksons - that Noah had not swerved his vehicle at Jared Zemo - and later to police Officer Holt. Plaintiffs assert that the statement to them was offered to show why they called the police and that the statement to Holt is offered to "prove selective enforcement." If this witness had testified himself about what he told the Jacksons or Holt, then that testimony would not be hearsay. But when the Jacksons repeat that statement, as they do here, and when the statement is meaningless if it is not being offered for its truth, then the statement is hearsay.

These statements, when offered by anyone other than the declarant, are inadmissible hearsay.

The same is true for Noah's statement that he was told by "civilian kids" that he was going to be arrested later. Plaintiffs assert that the statement is offered to show that there was a conspiracy and/or that the police were informing others in the community that Noah was going to be arrested. This is certainly a "statement" within the meaning of Fed.R.Evid. 801 - the declarants intended to convey information. See, Superior Fireplace Co. v. Majestic Prods. Co., 270 F.3d 1358, 1365-66 (Fed.Cir. 2001). This "statement" goes nowhere to prove conspiracy or misconduct unless it is being offered for its truth. This statement, when offered by the Jackson's rather than the declarant, is inadmissible hearsay.

Defendants also challenge a statement in Noah's affidavit because Noah lacks the requisite personal knowledge. See, Fed.R.Civ.P. 56. The statement is that Holt had a ticket written out before he arrived at the Jackson home. Noah has not explained how he knew this, and his statement at the end of the affidavit is not conclusive - all that says is that the basis of his affidavit is "knowledge, information and belief". But it is not impossible that Noah would have been able to tell that the ticket was completed before Holt arrived. I will not strike that paragraph in the affidavit.

Accordingly, the motion to strike portions of Noah's affidavit (Exh. 4 to Plaintiff's Response to Summary Judgment) is granted in part and the following paragraphs are stricken: paragraphs 6, 14 and 20 in their entirety, and paragraph 12 as to what Harmon said.

4

Next Defendants challenge certain statements contained in Nicholas Jackson's affidavit.  The first is Nicholas' statement that a student at school had directed a racial epithet at another student.  The second is Nicholas' summary of that student's testimony at Nicholas' trial, offered as explanation for why  charges of battery against Noah were dropped.  Like the statements above, neither of these statements has been offered for its truth; they are therefore not hearsay.

The second statement in Nicholas' affidavit is Nicholas' recall of what Jared Zemo said during the rock-throwing incident.  Defendants have misunderstood this paragraph of the affidavit.  This statement, too is not offered for its truth, and it is therefore not hearsay.

Defendants next challenge a statement contained in the affidavit of Alexandria Jackson, that Jared Zemo "pointed to something on his arm that Jared claimed meant, 'niggers die.' " Conduct meant to convey information or make an assertion is considered to be a statement under Rule 801.  See, U.S. v. Abou-Saada, 785 F.2d 1,8 (1st Cir. 1986).  But like the statements discussed above, this statement is offered not for its truth but rather as evidence of racial harassment by Jared Zemo.  It is therefore not hearsay and it is admissible for that purpose.

Next Defendants assert that two statements contained in Peggy Jackson's affidavit are hearsay.  The first is a statement that Nicholas told police who threw rocks at him.  The evidence before the court demonstrates that Peggy was not present when Nicholas made this statement, so she lacks the requisite personal knowledge.  Moreover, even if she had been present, she was not the declarant and the statement is meaningless unless true.  This statement is inadmissible hearsay.

The second statement is Peggy Jackson's recall of what some "other witnesses" told Moline Police Officer McAtee about the events leading up to Alexandria's altercation with another girl. Plaintiffs assert that this statement is offered not for its truth but to show a "pattern of non-enforcement by the police when they had knowledge of independent witnesses corroborating Jackson's version of events." But it is offered for its truth - if what the witnesses said was not true, then the statement is not evidence of non-enforcement. This is hearsay when recounted by Mrs. Jackson and it is therefore inadmissible.

Defendants also challenge two statements in Mrs. Jackson's affidavit on the grounds that she lacked personal knowledge of the information in those statements. It is very clear that Defendants are correct that she was not personally present at these incidents; she is basing her statements on what she was told by others. These two statements are therefore stricken.

Accordingly, the motion to strike portions of Peggy Jackson's affidavit (Exh. 8 to Plaintiff's Response to Summary Judgment) is granted in part and the following paragraphs are stricken from her affidavit: paragraphs 2 and 7 in their entirety; and paragraph 14 as to what the "other witnesses" told Officer McAtee.

Defendants next argue that two statements contained in the affidavit of Philip Jackson Sr. are inadmissible hearsay. These statements both have to do with racial epithets he heard yelled outside the Jackson home in Milan. As discussed above, these are not hearsay.

Finally the Defendants point to a large number of speculative statements contained in the Jacksons' statement of additional material facts, such as whether the police "properly investigated" an incident, whether they did "nothing" after an incident. Such statements are

6

not based on first hand knowledge by the Jacksons and they may not testify about such matters.

Similarly, their conclusions - for example, that the police "selectively enforced" the law or that the police would do nothing to help if a victim were Black, or that a certain person is a racist or a bigot - are not facts.  The Jacksons can certainly testify about their experiences that lead them to draw such conclusions, but they may not establish by affidavit a conclusion that can only be drawn by the fact-finder.  These matters are stricken from the Jacksons' responsive pleading and have not been considered by the Court in this Order.

Finally, Defendants point to a number of assertions in the Plaintiffs' Introduction section and argument section of their Response that are unsupported by citations to the record.  The Court has not relied on any asserted fact unless the fact is (1) accompanied by a citation to the record; and (2) supported by the record cited.  As stated above, the motion to strike is granted in part and denied in part.  Moreover, to the extent that factual or legal arguments contained in Plaintiffs' response to the summary judgment motion rely on any of this stricken material or rely on speculative statements of fact or improper conclusions, as discussed above, or rely on statements of fact not supported by citation to the record, those arguments are also stricken and have not been considered by the Court in this Order.

## UNDISPUTED FACTS

Plaintiffs are an African-American family.  Peggy and Phillip Sr. are married.  Their four children are Phillip Jr., Alexandria, Noah, and Nicholas.

7

The defendants in this case are the City of Moline, its Police Chief Steve Etheridge, Police Captain Kenneth Hanger, and Police Officer John McAtee [hereinafter referred to where necessary as the "Moline defendants"]; and the Village of Milan, its Police Chief Dennis Baraks, Police Captain Mark Beckwith, Police Sergeant Scott Holt, and Police Officer Richard Ward [hereinafter referred to where necessary as the "Milan defendants"].

The following factual recitation is taken from the parties' statements of undisputed facts, the responses and replies thereto, and the evidentiary support therefor.

While the Jacksons resided in Moline, they had problems with vandalism: slashing of the tires on their car and motorcycle, scratching of their vehicles, trash being thrown on their property, and other property damage. The Jacksons believed these problems were motived at least in part by racism on the parts of certain of their neighbors. Police Captain Kenneth Hanger met several times with Mrs. Jackson with respect to the vandalism claims. Mrs. Jackson provided the names of two people she suspected, and the police followed up and questioned them. The Jackson's filed a complaint about the vandalism with the NAACP in 1998 against the City of Moline; the NAACP concluded that the Moline Police Department was doing their job properly.

On October 15, 1998, the Jacksons' 13 year old daughter Alexandria was involved in a dispute with another juvenile, Bryck Campos. According to Alexandria and her brother Nicholas, Bryck threw a small piece of wood (1/4 inch) at Nicholas, who was riding his bicycle. The wood hit Nicholas on his glasses. Alexandria went home and told her mother. Later Nicholas came home and said Bryck was back in the park. Mrs. Jackson sent Alexandria back to the park to see if Bryck was still there. Alexandria took Mr. Jackson's mace from his dresser and went to the park. According to an eyewitness (unrelated to

8

either family), Alexandria walked up to Bryck, asked him "why did you throw a rock at my brother," and then sprayed him in the face with mace.  Neither Alexandria nor Nicholas ever denied that she had sprayed Bryck.  Alexandria was charged by Moline Police Detective Scott Williams with violation of a municipal aggravated battery ordinance; she was not taken into custody.  The arresting officer's report shows that he interviewed Bryck, Alexandria, the eye witness, Nicholas Jackson, and Peggy Jackson.  The report also shows the officer's intent to request a Delinquency Petition from Juvenile Court Services.

On another occasion, Alexandria was charged with violation of the municipal battery ordinance after she punched a girl and shoved her to the ground for spitting at her.  There is a dispute about whether there were witnesses to this event.  McAtee says Alexandria never mentioned any witnesses; she claims that she did.  McAtee wrote Alexandria a citation for an ordinance violation and gave it to her.  She was not taken into custody.

Alexandria had other involvement with local law enforcement.  She was caught shoplifting at Kohls; and was sentenced to serving community service time.  She was involved in making harassing phone calls to another student; the police investigated and the calls ended without charges.

Another Jackson child, Nicholas, was a student at Wilson Middle School.  There he had a reputation for being a bully.  The City of Moline police officer assigned to that school, Alan Friedland, was aware that Nicholas had been accused of harassing and bullying Frank, a student in the learning disabled program.  Friedland had at least two meetings with the boys following complaints from the boys' parents about the bullying by Nicholas. On October 1, 2001, Frank reported to the principal that Nicholas had hit him in the back of the head while they were in a stairwell.  Frank had then turned around and took a swing

9

at Nicholas.  Witnesses to the fight between Nicholas and Frank reported that the fight took place in a stairwell and that Nicholas had both hands around Frank's neck.  Frank received minor abrasions and scratches around the neck area, still evidenced several hours later. The fight occurred after Nicholas had earlier threatened to "kick his ass after school" and after one of the boys' teachers reported that Nicholas was taunting Frank in her class.

The principal called Mrs. Jackson to the school, and Friedland interviewed Nicholas in the presence of his mother and the principal.  Nicholas claimed that another student had hit Frank and that Frank thought it was him and had then tried to hit him.  Nicholas said that he was justified in hitting anyone who threw a punch at him first.

Friedland also interviewed another student who reported that Nicholas had told him to punch Frank from behind, so that Frank would think Nicholas did it.  The student hit Frank with an open hand on the back of his head, claiming that he did what Nicholas asked because if he didn't Nicholas would "beat me down."  Friedland also spoke to several other witnesses to the fight who all said that Nicholas was the aggressor.

Detective Friedland found Frank and the other witnesses more credible than Nicholas, and he concluded that Nicholas had provoked a fight with Frank by directing another student to hit Frank in a way that would make Frank think it was Nicholas who had done it.  Then, when Frank reacted, Nicholas would feel justified in battering Frank. Friedland therefore cited Nicholas for violating a municipal battery ordinance.  After the ticket was issued, the principal told Friedland that Nicholas had taped a "conversation" he had with Frank and that Frank admitted that he had hit Nicholas.  Mrs. Jackson had called the principal about the tape and had said that if he didn't do something about the ticket, the

10

"School District will go down with the Moline Police Department."   At the trial, Frank recanted his claims against Nicholas, and the case was dismissed.

There was also an incident in which a white juvenile threw a rock at Nicholas, hitting him in the head and causing him to fall from his bicycle.  Nicholas was taken  to the hospital where his head injury was stitched.  He told the police who his assailant was.  Mrs. Jackson called Chief Etheridge who referred her to Captain Hanger.  She  was told by Hanger that no criminal charges would be filed because the assailant had a mental problem.  He suggested to her that it was a civil matter.

At the age of 11, Nicholas was suspended from school for stealing a lap top computer from the school.  There was no arrest.  There was another incident where several people stopped him while he was riding his bike and tried to assault him.  The police were called.  The others were arrested.  There were also numerous altercations between Nicholas and members of his family, some of which involved the police.

The police chief at the time was Steven Etheridge.  When the Jacksons contacted the police on various occasions, they claim to have been told that they could not file charges against another party unless there were two independent corroborating witnesses.  The Jacksons believe that the police in Moline treated them differently because they were black and that other parties could press charges without corroborating witnesses.  In part due to these problems in Moline, the Jacksons moved to Milan, Illinois.

In Milan, the Jacksons claim to have been victimized by racial harassment from the Zemos, who are a Caucasian family residing two blocks from the Jacksons.  There was quite a history of animosity between members of the Jackson family and one member of the Zemo family, minor son Jared Zemo.  Jared Zemo has been in trouble with the police

11

since he was very young, with charges of curfew violations, harassment, bike theft, criminal damage to property and the like.  The police were frequently at the Zemo's home, usually because of Jared.  His own father estimated that there were over 30 such visits.

The Milan Police Chief testified that he could not remember any other situation that had demanded so much of the department's resources.  The first time any of this hostility involved the Village of Milan Police Department was on January 9, 2002.  On that date, Jared and two of his friends stood outside the Jacksons' home yelling racial epithets and throwing rocks.  All three boys were detained by the Milan police.  A police report was sent to the State's Attorney, and the three boys were required to pay restitution to the Jacksons. The Jacksons admit that this incident was handled properly by the police.  They also point out that this was the only charge against a member of the Zemo family relating to any incidents involving members of the Jackson family.

Later in January of 2002, Alexandria Jackson was in the family's garage.  Jared Zemo arrived at the residence with two of his friends.  They began throwing rocks at the Jackson residence, ultimately causing nearly $2000 in damage.   When Alexandria threatened to call the police, the boys responded with racially derogatory comments.

Later in the month, Jared returned to the Jackson house, purportedly to apologize. He did not apologize, however, instead making threatening gestures to Nicholas. According to Alexandria, she pushed Jared away from Nicholas.  According to Jared, Alexandria hit him with a hammer.  The Jacksons called the police; before they arrived, Jared left and went to a friend's house.  A Milan police officer, Sergeant Scott Holt, arrived on the scene.  He interviewed Alexandria and Mrs. Jackson.  At a later time, he interviewed Jared.  According to Alexandria, Holt did not write down anything she told him.

12

The two families later agreed not to proceed with the matter, signing a "Request for Dismissal" form in an effort to resolve the dispute. Chief Baraks explained these forms as being generally used when "it appears that a case could be solved amicably." The form stated that "If I desire prosecution, I know full well that the Milan Police Department will assist me in this cause and encourage me to pursue this cause." The agreement included an understanding that the families would try to keep their children away from each other and make the effort to avoid further problems, according to Officer Holt.

Later, however, on February 27, Steve Zemo was in court with his wife and Jared on a matter relating to the Jacksons, who were also in court at the time. While in court, Alexandria made "hammering" gestures at Jared, according to Steve Zemo, as well as waving, winking and making other "antagonizing" gestures. Alexandria's father Philip also was reported to have asked Jared in the courthouse if he "wanted a piece" of Philip. Based on this conduct, Steve Zemo told Holt that he wanted to press charges for the January incident, and he withdrew his Request for Dismissal. Holt's police report and a supplement describing the courthouse conduct was then sent to the State's Attorney. In February, Alexandria was charged with battery and in March a petition for delinquency was filed. Alexandria was found not guilty.

The Jackson's believe that there was a race-based conspiracy between the Zemos, the named Milan police officers and the police department, and the State's Attorney, the goals of which were to disavow the Request for Dismissal, to press charges against Alexandria, and to file a false delinquency petition against Alexandria. In the opinion of the Jacksons, there could be no other explanation for those actions. Peggy Jackson stated it was a conspiracy because "that's what they did," for example, while her son Philip stated

he believed there was a conspiracy "Just because I do.  It's my belief."  Alexandria's belief in conspiracy was based on the fact that she and Noah were arrested.  Nicholas' belief was based on the fact that when the police were called about Jared Zemo and his family, they seemed "to get away with it."  None of the Jacksons had ever met or talked to the adult Zemos.

In February of 2002, the Zemos received a letter from the Milan police department, advising that the frequent reports of misconduct had been forwarded to the State's Attorney for review.  Various provision of Illinois' hate crime statute and the Parental Responsibility Act were discussed in the letter.  This letter was also sent to the parents of the other two boys involved in the January rock-throwing incident.  The letter was triggered by a meeting between Mrs. Jackson and then-officer Mark Beckwith.  The Jacksons were copied on this letter.

On July 2, 2002, Jared Zemo reported that another Jackson child, Noah,  swerved his car toward Jared and one of Jared's friends, as they were riding bicycles.  On this same date, Noah reported to his mother that Jared had yelled racial epithets at him as he rode past the Zemo house.  Both families called the police.  Officer Holt interviewed the Zemos and a different police officer, Officer Rumley, interviewed the Jacksons.  Another witness, Scott Kerkhoff, corroborated Jared's version of events. Rumley then issued to Noah a citation for violation of Milan's Disorderly Conduct ordinance.  No  charge was filed against Jared.

In July of 2002, the Jacksons complained to a local television station and provided the station with a video showing persons driving by the Jackson home yelling racial epithets.  The station aired that video and did a spot on the harassment.

14

Also in July 2002, the Rock Island County State's Attorney increased the charges against Noah to include reckless conduct and aggravated assault, obtained a warrant on those charges, and had Noah arrested.  The arrest warrant was served by a County Sheriff's Deputy; Milan officer Ward accompanied him to make the arrest.  These charges were ultimately dismissed by an Assistant State's Attorney.

On September 12, 2002, Phillip Jackson Jr. was accused of spraying mace in Jared Zemo's face.  The police investigated but he was not charged.

The Jacksons also claim to have been subjected to racial hostility from the Zemos. According to the Jacksons, the Zemos would shout racial slurs while driving by the Jackson house and would engage in other conduct directed at the Jacksons.  Another Zemo son, Jason, allegedly swerved his car at Nicholas Jackson while he was walking down the street with a friend.  A police officer responded to the Jackson's report of this incident but did not even bring a notepad.  No arrest was made.

One or more of the members of the Jackson family testified in their depositions as to their belief that the Milan Police Department, the Moline Police Department, their Chiefs of Police, the State's Attorney, and all the government agencies in the Quad Cities are racists.  Mrs. Jackson testified that the Milan Police Department "does a very, very good job of protecting their racists and their drug dealers."  She also believes that in all employment situations and housing situations, whites will get more benefits than blacks. She believes that any time a racial comment is uttered, the crime of disorderly conduct has been committed.  Similar comments and beliefs were voiced by each member of the Jackson family.

15

The only race-based statement any of the Jacksons could attribute to any member of either police department was a statement by Milan Police Chief Dennis Baraks[1] that racism may be a matter of perspective: that if you are white, racism doesn't exist, while if you are black it does.  None of the Jacksons recalled a single incident of name-calling or overt racial misconduct by any one of the Defendants.

While the Jacksons are very critical of the actions taken (or not taken) by the Milan Police Department and all stated their beliefs that one or some or all of the police officers are racists, they also acknowledge that the police always responded to their calls and always treated them with respect.  Neither the Jacksons nor Chief Baraks know of any other complaints of racial discrimination against Milan's Police Department.

The Jacksons filed this lawsuit, based on their belief that the police departments of the Village of Milan and the City of Moline were ineffective in responding to their complaints about this harassment and that the reason for this was racism in those departments.  In the Fourth Amended Complaint, Plaintiffs assert the following claims:

-- **Count I** against the City of Moline, alleging under 42 U.S.C. § 1983 that the City had a policy or practice of selective enforcement in violation of the Fourth Amendment's prohibition against arrest without probable cause and the Fourteenth Amendment's Equal Protection guarantee.  This Count also claims that the City conspired with the Rock Island County State's Attorney to violate these same rights in violation of § 1985(3).

---

[1]Baraks was the Chief until 2003.  He was replaced by Mark Beckwith who is still the Chief of Police for the Village.

-- **Count II** against the Village of Milan, alleging that the Village had a practice or policy of selective enforcement in violation of the Fourth Amendment's prohibition against arrest without probable cause and the Fourteenth Amendment's Equal Protection guarantee.  This Count also claims that the Village conspired with the Rock Island State's Attorney's office to violate these same rights in violation of § 1985(3).

-- **Count III** against Marshall Douglas (the Rock Island County State's Attorney) and **Count IV** against Max Cartwright (an assistant State's Attorney in Rock Island County), were dismissed by Order entered July 15, 2004.

-- **Count V**, against Milan Police Chief Dennis Baraks, alleging that he was the decision maker with regards to law enforcement in the Village, that he was part of the conspiracy with the State's Attorney and the Zemos to selectively enforce the law and to make unlawful arrests, as well as in pursuing the delinquency petition against Alexandria Jackson, and that he condoned the misconduct of various police officers under his command.

-- **Count VI**,  against the individual Milan defendants, Police Captain Beckwith, Sergeant Holt, Officer Ward, and against Steven and Rebecca Zemo, alleging that they conspired (along with the State's Attorney for Rock Island County) to violate the Jacksons rights, that they falsely arrested Noah Jackson, that the investigations into various Jackson complaints were constitutionally deficient, and that false police reports were filed as part of the conspiracy.

-- **Count VII**, against the individual Moline defendants, Police Chief Steve Etheridge, Captain Kenneth Hanger, Officer John McAtee, and Detective Alan

17

Friedland, alleging that they arrested Nicholas, Noah and Alexandria without probable cause, selectively enforced the law, and conspired with the other Defendants to accomplish those ends.

There are three pending motions for summary judgment, one from each "group" of Defendants.  They challenge all aspects of the Plaintiffs' claims.

## LEGAL STANDARDS

### SUMMARY JUDGMENT GENERALLY

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment should be entered if and only if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. See Jay v. Intermet Wagner Inc., 233 F.3d 1014, 1016 (7th Cir.2000);  Cox v. Acme Health Serv., 55 F.3d 1304, 1308 (7th Cir. 1995).

In ruling on a summary judgment motion, the court may not weigh the evidence or resolve issues of fact; disputed facts must be left for resolution at trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).  The court's role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe.  Waldridge v. American Hoechst Corp., 24 F.3d 918, 922 (7th Cir.1994).  The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial.

The court is to examine all admissible facts, viewing the entirety of the record and accepting all facts and drawing all reasonable inferences in favor of the non-movant,

18

Erdman v. City of Ft. Atkinson, 84 F.3d 960, 961 (7th Cir. 1996); Vukadinovich v. Bd. of Sch. Trustees, 978 F.2d 403, 408 (7th Cir. 1992), cert. denied, 510 U.S. 844 (1993); Lohorn v. Michal, 913 F.2d 327, 331 (7th Cir. 1990); DeValk Lincoln-Mercury, Inc. V. Ford Motor Co., 811 F.2d 326, 329 (7th Cir. 1987); Bartman v. Allis Chalmers Corp., 799 F.2d 311, 312 (7th Cir. 1986), cert. denied, 479 U.S. 1092 (1987), and construing any doubts against the moving party.  Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970);  Trotter v. Anderson, 417 F.2d 1191 (7th Cir. 1969); Haefling v. United Parcel Serv., Inc., 169 F.3d 494, 497 (7th Cir.1999).  The existence of "some alleged factual dispute between the parties," or "some metaphysical doubt," however, does not create a genuine issue of fact. Piscione v. Ernst & Young, L.L.P., 171 F.3d 527, 532 (7th Cir.1999). The proper inquiry is whether a rational trier of fact could reasonably find for the party opposing the motion with respect to the particular issue. See, e.g., Jordan v. Summers, 205 F.3d 337, 342 (7th Cir.2000).

The parties must identify the evidence (i.e. those portions of the pleadings, depositions, answers to interrogatories, admissions, affidavits, and documents) that will facilitate the court's assessment.  Waldridge, 24 F.3d at 922.  Thus, as Fed.R.Civ.Proc. 56(e) makes clear, a party opposing summary judgment may not rely on the allegations of her pleadings. Rather:

> [T]he adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

See, Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  See also, Local Rule CDIL 7.1(D).

19

Neither the moving party nor the responding party may simply rest on allegations; those allegations must be supported by significant probative evidence tending.  First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 290 (1968).  See also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)(when the moving party has met its burden, non-moving party must do more than show some "metaphysical doubt " as to material facts).  A scintilla of evidence in support of the non-moving party's position is not sufficient to oppose successfully a summary judgment motion; "there must be evidence on which the jury could reasonably find for the [non-movant]." Anderson, 477 U.S. at 250.

If the facts indicate that no reasonable jury could find for the party opposing the motion, then summary judgment must be granted.  Hedberg v. Indiana Bell Tel. Co., 47 F.3d 928, 931 (7th Cir. 1995), citing Anderson, 477 U.S. at 248. 1995).  If the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party and on which that party will bear the burden of proof at trial, then summary judgment is proper.  Celotex, 477 U.S. at 322; Waldridge, 24 F.3d at 920.

## SECTION 1983 GENERALLY

Liability under § 1983 requires proof that the defendants were acting under color of state law and that the defendants' conduct violated the plaintiff's rights, privileges, or immunities secured by the Constitution or laws of the United States.  42 U.S.C. § 1983. See, Yang v. Hardin, 37 F.3d 282, 284 (7th Cir.1994); see also Kernats v. O'Sullivan, 35 F.3d 1171, 1175 (7th Cir.1994).

Private actors are not liable under § 1983 absent a specific relationship with a state actor.  The Seventh Circuit explained that relationship in Proffitt v. Ridgway, 279 F.3d 503, 510 (7th Cir.2002), as follows:

20

[T]he case law of this circuit acknowledges, quite straightforwardly, that what is essential to finding that a private actor has become a state actor is not the formality of his relationship with the state or its agent or the duration of that relationship. See, Wade v. Byles, 83 F.3d 902, 904-05 (7th Cir.1996). What is important is whether the state or its agent is aware of the participation of the private individual and "effectively directs, controls, or encourages the actions of a private party." Id. at 905; see also Payton v. Rush-Presbyterian-St. Luke's Med. Center, 184 F.3d 623, 628 (7th Cir.1999); United States v. Shahid, 117 F.3d 322, 326 (7th Cir.1997).

There is no *respondeat superior* liability under § 1983. Monell v. New York City Dept. of Social Svcs., 436 U.S. 658 (1978). Municipal liability for constitutional injury can only follow from a finding that the municipal employees who acted are liable on the underlying substantive claim. Treece v. Hochstetler, 213 F.3d 360, 363 (7th Cir. 2000), citing City of Los Angeles v. Heller, 475 U.S. 796 (1986). If the plaintiffs suffered no constitutional injury at the hands of the individual officers, the fact that custom, policy or practice may have authorized unconstitutional arrests "is quite beside the point." Heller, 475 U.S. at 799.

"Of course, every official abuse of power, even if unreasonable, unjustified, or outrageous, does not rise to the level of a federal constitutional deprivation ... Some such conduct may simply violate state tort law or indeed may be perfectly legal, though unseemly and reprehensible." Kernats, 35 F.3d at 1175. See also, Lanigan v. Village of East Hazel Crest, 110 F.3d 467, 471 (7th Cir.1997)

The first inquiry in nearly all § 1983 cases is to consider whether the plaintiff has alleged the violation of a constitutional right at all, a purely legal question, and this threshold question should be resolved at the earliest possible opportunity. Siegert v. Gilley, 500 U.S. 226 (1991); Hunter v. Bryant, 502 U.S. 224, 228 (1991). See also, County of Sacramento v. Lewis, 523 U.S. 833 (1998); Wilson v. Layne, 526 U.S. 603 (1999);

Denius v. Dunlap, 209 F.3d 944, 950 (7th Cir. 2000);  White v. Markham,310 F.3d 989, 993

(7th Cir.2002);  Saucier v. Katz, 533 U.S. 194, 201 (2001).

A private individual has no federal right to the prosecution of another. See, Linda

R.S. v. Richard D., 410 U.S. 614, 619 (1973).  See also,  Wayte v. United States, 470 U.S.

598, 607 (1985) ("In our criminal justice system, the Government retains broad discretion

as to whom to prosecute.");  Bordenkircher v. Hayes, 434 U.S. 357, 364 (1978) ( "[T]he

decision whether or not to prosecute, and what charge to file or bring before a grand jury,

generally rests entirely in [a prosecutor's] discretion.");  United States v. Batchelder, 442

U.S. 114, 124 (1979).

## FOURTH AMENDMENT

The Fourth Amendment prohibits arrests without probable cause.  See, Jones by

Jones v. Webb, 45 F.3d 178, 181 (7th Cir.1995).  Although the issue of probable cause in

a damages suit like this one generally is a jury question, the court may find that probable

cause existed as a matter of law  "when there is no room for a difference of opinion

concerning the facts or the reasonable inferences to be drawn from them."  Booker v.

Ward, 94 F.3d 1052, 1057-58 (7th Cir.1996), quoting Sheik-Abdi v. McClellan, 37 F.3d

1240, 1247 (7th Cir. 1994), cert. denied, 513 U.S. 1128 (1995).  See also, Lanigan v.

Village of East Hazel Crest, 110 F.3d 467, 473 (7th Cir.1997).

A law enforcement officer has probable cause to arrest when "the facts and

circumstances within [his] knowledge and of which [he has] reasonably trustworthy

information [are] sufficient to warrant a prudent [person] in believing that the [suspect] had

committed or was committing an offense."  Id., quoting Beck v. Ohio, 379 U.S. 89 (1964).

Probable cause is evaluated "not on the facts as an omniscient observer would perceive

them but on the facts as they would have appeared to a reasonable person *in the position of the arresting officer* - seeing what he saw, hearing what he heard." Mahoney v. Kesery, 976 F.2d 1054, 1057 (7th Cir.1992) (emphasis in original). There must be more than bare suspicion, but the basis for probable cause need not be sufficient to support a conviction or to show that the officer's belief was more probably true than false. Brinegar v. U.S., 338 U.S. 160 (1949), cited in Anderer v. Jones, 412 F.3d 794, 798 (7th Cir. 2005).

Once police officers have discovered sufficient evidence to establish probable cause, the Constitution does not demand that they conduct further investigation in order to seek out other, possibly exculpatory evidence. Garcia v. Chicago, 24 F.3d 966, 970 (7th Cir. 1994), citing Schertz v. Waupaca County, 875 F.2d 578, 583 (7th Cir. 1989). While further investigation may be wise, it is not "constitutionally compulsory." Garcia, 24 F.3d at 970. Similarly, Baker v. McCollan, 443 U.S. 137 (1979) rejected a requirement that law enforcement officials exercise "due diligence" to determine whether a detainee is in fact innocent, holding that officials need not "investigate independently every claim of innocence." Id. at 146; see also Garcia, 24 F.3d at 973; Thompson v. Duke, 882 F.2d 1180, 1186 (7th Cir.1989), cert. denied 495 U.S. 929 (1990); Schertz v. Waupaca County, 875 F.2d 578, 583 (7th Cir.1989). Nor does probable cause come down to whether the arrest resulted in a conviction. Lanigan v. Village of East Hazel Crest, 110 F.3d 467, 473 (7th Cir.1997), quoting U.S. v. Smith, 80 F.3d 215, 219 (7th Cir.1996). See also Whren v. U.S., 517 U.S. 806 (1996).

Personal involvement is a prerequisite for individual liability under § 1983. No liability can arise simply by virtue of *respondeat superior*. Doyle v. Camelot Care Centers,

Inc., 305 F.3d 603 (7th Cir. 2002);  Kitzman-Kelley v. Warner, 203 F.3d 454, 455 (7th Cir. 2000).

This applies equally to supervisors, who are not liable, simply by means of their position of authority, for the conduct of a subordinate who violated a plaintiff's constitutional rights.  Kernats v. O'Sullivan, 35 F.3d at 1182, citing Monell v. Dept. of Social Services, 436 U.S. 658, 691(1978)).   In order to be liable for the conduct of subordinates, a supervisor must be personally involved in that conduct.  Wolf-Lillie v. Sonquist, 699 F.2d 864, 869 (7th Cir.1983).  In  Jones v. City of Chicago, 856 F.2d 985, 992 (7th Cir.1988), the Court of Appeals clarified what is meant by being "personally involved"  when evaluating the liability of supervisors.  The Court held that "supervisors who are merely negligent in failing to detect and prevent subordinates' misconduct are not liable, because negligence is no longer culpable under § 1983."  856 F.2d at 992.  Likewise, gross negligence is also not enough to impose supervisory liability.  Id.  Rather, "supervisors must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see. They must in other words act either knowingly or with deliberate, reckless indifference." Id. at 992-93.  See also,  Chavez v. Illinois State Police, 251 F.3d 612 (7th Cir. 2001) (Supervisory liability only results if the supervisor, with knowledge of the subordinate's conduct, approves of the conduct and the basis for it.).

Under some circumstances, "[o]missions as well as actions may violate civil rights" and that "under certain circumstances a state actor's failure to intervene renders him or her culpable under § 1983." Yang v. Hardin, 37 F.3d 282, 285 (7th Cir.1994).  An officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983 if that officer had

reason to know that a citizen has been unjustifiably arrested,  and the officer had a realistic opportunity to intervene to prevent the harm from occurring.  Id. (citing Anderson v. Branen, 17 F.3d 552, 556 (2d Cir.1994)); see also Thompson v. Boggs, 33 F.3d 847, 857 (7th Cir.1994), cert. denied, 514 U.S. 1063 (1995).  Whether an officer had sufficient time to intervene or was capable of preventing the harm caused by the other officer is generally an issue for the trier of fact unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise. Anderson, 17 F.3d at 557.

## EQUAL PROTECTION

The Equal Protection Clause of the Fourteenth Amendment protects individuals from discriminatory administration and enforcement of the law.  There are two pertinent types of Equal Protection claims: a claim that one has been treated differently based on a suspect classification, and a claim of selective enforcement of the law.

For plaintiffs to show that they were treated differently based on a suspect classification, they must produce evidence that the defendants' actions had a discriminatory effect and that defendants were motivated by a discriminatory  purpose. See Pers. Adm'r of Mass. v. Feeney, 442 U.S. 256, 272-74 (1979), cited in Dunn v. Washington County Hosp., 429 F.3d 689 (7th Cir. 2005).  See also,; Arlington Heights v. Metro. Housing Dev. Corp., 429 U.S. 252, 264-66 (1977); Washington v. Davis, 426 U.S. 229, 239-42 (1976).

To prove discriminatory effect,  plaintiffs are required to show that they are members of a protected class, that they are otherwise similarly situated to members of the unprotected class, and that plaintiffs were treated differently from members of the unprotected class. See Greer v. Amesqua, 212 F.3d 358, 370 (7th Cir .2000), cert.

denied, 531 U.S. 1012 (2000); Johnson v. City of Fort Wayne., 91 F.3d 922, 944-45 (7th Cir.1996);  Chavez v. Illinois State Police, 251 F.3d 612, 636 (7th Cir. 2001).

To show discriminatory intent, plaintiffs must show that the "decisionmakers acted with discriminatory purpose." McCleskey v. Kemp, 481 U.S. 279, 292 (1987); Nabozny v. Podlesny, 92 F.3d 446, 453 (7th Cir.1996).  " Discriminatory purpose' ... implies more than ... intent as awareness of consequences. It implies that the decisionmaker ... selected or reaffirmed a particular course of action at least in part 'because of'... its adverse effects upon an identifiable group. " McCleskey, 481 U.S. at 298, quoting Feeney, 442 U.S. 256, 279; see also,  Hearne v. Bd. of Educ. of City of Chi., 185 F.3d 770, 776 (7th Cir.1999).

Selective enforcement is a "murky corner of equal protection law ."  Smith v. City of Albany , 2006 WL 839525, 15 (N.D.N.Y. 2006), quoting LeClair v. Saunders, 627 F.2d 606, 608 (2d Cir.1980).  The Seventh Circuit has recognized the difficulty of proceeding with equal protection claims brought by a "class of one."  See McDonald v. Village of Winnetka 371 F.3d 992, 1001-02 (7th Cir. 2004), citing Levenstein v. Salafsky, 164 F.3d 345, 353 (7th Cir.1998).

A class of one equal protection claim may be brought where (1) the plaintiff alleges that he has been intentionally treated differently from others similarly situated; and (2) there is no rational basis for the difference in treatment or the cause of the differential treatment is a "totally illegitimate animus" toward the plaintiff by the defendant. McDonald, 371 F.3d at 1001.  See also,  Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000); Nevel v. Village of Schaumburg, 297 F.3d 673, 681 (7th Cir.2002).

In <u>Olech</u>, the Supreme Court held that an individual who has not been singled out because of race or some other invidious reason can still obtain a remedy under the Equal Protection Clause if the government's treatment was "irrational and wholly arbitrary." <u>Id.</u> at 565.  Following <u>Olech</u>, the Seventh Circuit held that a "class of one" plaintiff must present evidence that the defendant "deliberately sought to deprive him of the equal protection of the laws for reasons of a personal nature unrelated to the duties of the defendant's position." <u>Hilton v. City of Wheeling</u>, 209 F.3d 1005, 1008 (7th Cir. 2000).

**<u>CONSPIRACY</u>**

Private conspiracies to deprive persons of federal rights are prohibited by statute. 42 U.S.C. § 1985(3).  To establish such a conspiracy, plaintiffs must show (1) the existence of a conspiracy; (2) a purpose of depriving a person or class of persons of equal protection of the law; (3) an act in furtherance of the conspiracy; and (4) an injury to person or property or a deprivation of a right of privilege granted to US citizens. <u>Green v. Benden</u>, 281 F.3d 661,666 (7th Cir. 2002).  See also, <u>Alexander v. City of South Bend</u>, 433 F.3d 550  (7th Cir. 2006)(plaintiff must show that people agreed to injure plaintiff, in order to deprive him of his constitutional rights, and that an act was committed in furtherance of the agreement, and that he was injured).

The plaintiff must show some racial invidiously discriminatory animus behind the conspirators' actions. <u>Green</u>, 281 F.3d at 661; <u>Alexander</u>, 433 F.3d at 550.

To establish the existence of a conspiracy, the plaintiff must show that the conspirators agreed to inflict injury, acting with a single plan, the general nature and scope of which was known to each conspirator. <u>Green</u>, 281 F.3d at 665.

27

Conspiracy may also be alleged under § 1983.  As is true generally of § 1983 cases, the focus is on state actors.  A private individual acting alone has no liability under § 1983.  Where, however, a private individual is a voluntary participant in a common venture with a state actor, and the purpose of the venture is to deprive a plaintiff of civil rights, then the individual can be held accountable under § 1983.  Dennis v. Sparks, 449 U.S. 24, 27 (1980); Adickes v. S.H.Kress & Co., 398 U.S. 144 (1970).  Case v. Milewski, 327 F.3d 564, 567 (7th Cir. 2003); Nickum v. Village of Saybrook, 972 F. Supp. 1160, 1170 (C.D.Ill. 1997).  If the individual actor understands the objectives of the agreement, accepts them, and agrees either explicitly or implicitly to participate in furthering the agreement, then the individual is a conspirator.  Jones v. Chicago, 856 F.2d 985, 992 (7th Cir. 1988).  Sharing a common goal, however is not the same thing as a mutual goal to trample on someone's constitutional rights.  Hanania v. Loren-Maltese, 212 F.3d 353, 357 (7th Cir. 2000).

A conspiratorial agreement may be shown by circumstantial evidence but only if it would be reasonable to conclude that the conspirators had in fact reached an understanding to injure the plaintiffs.  Alexander, 433 F.3d at 550; Green, 281 F.3d at 666.  Assertions of conspiracy without any evidentiary support are not sufficient to defeat summary judgment; any circumstantial evidence must be sufficient to permit a reasonable jury to conclude that a meeting of the minds occurred and that the parties had an understanding to achieve the objectives thereof.  Id.  See also, Amundsen v. Chicago Park Dist., 218 F.3d 712, 718 (7th Cir. 2000); Stagman v. Ryan, 176 F.3d 986, 995 (7th Cir. 1999).

Where there was no constitutionally-cognizable injury, there can be no conspiracy claim under either §1983 or §1985(3).  See, <u>Bublitz v. Cottey</u>, 327 F.3d 485, at n.3 (7th Cir. 2003).

## DISCUSSION

## <u>MOLINE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

There does not appear to be any doubt that the Jacksons' neighbors  exhibited reprehensible racial harassment directed toward the Plaintiffs.  The Court finds their conduct appalling.  Nonetheless, the fact that the neighbors behaved in such offensive ways does not  establish liability on the part of the Moline Defendants.  The three arrests at issue in Plaintiffs' Fourth Amendment claims against the Moline defendants are the arrest of Nicholas for battery in 2001 and the arrests of Alexandria for aggravated battery in 1998 and for battery in 2001.

In the arrest of Nicholas, the arresting officer was defendant Alan Friedland. Friedland's job entailed much time spent at the school where Nicholas was a student. He was aware of Nicholas' ongoing reputation as a bully, and he was aware that there had been ongoing problems between Nicholas and Frank.  He had heard from one of the teachers that Nicholas had been taunting Frank earlier in the day.  Frank's parents had previously complained about Nicholas.  Friedland spoke to both Frank and to Nicholas before he made any arrest.

Only the Plaintiffs' speculation, which is based on not one objective fact, is cited for the argument that this arrest was based on anything less than probable cause or that race entered into Friedland's assessment of the circumstances.  Based on what Friedland knew, heard and observed, it was entirely reasonable for him to accept Frank's

version of the events.  Moreover, it would be unreasonable for a jury to conclude that probable cause did not exist.  There was no violation of the Fourth Amendment in this arrest.

The October 15, 1998 charge against Alexandria Jackson for aggravated battery of Bryck Campos resulted from an investigation that included interviews of both the children, and an uninvolved eye witness.  At no time was there any denial by  Alexandria that she had actually sprayed mace on Bryck.  Given her admission of a battery,  it would be unreasonable to conclude that there was no probable cause for her arrest.  Plaintiffs' arguments to the contrary may have gone to a defense against the charge, but they do not invalidate the officer's determination of probable cause.  There was no Fourth Amendment violation.

The arrest of Alexandria Jackson on August 6, 2001, for battery on Ashley Madison resulted after Alexandria admitted to hitting Madison.  There is a dispute between the parties as to whether there were witnesses to the events that led up to the physical altercation, but given Alexandria's admission, Officer McAtee's citation was supported by probable cause.  Those witnesses may have helped her case at trial, but once again the existence of evidence helpful to the defense is not an argument that undercuts the officer's conclusion that there was probable cause for her arrest.  There was no Fourth Amendment violation.

Plaintiffs have also asserted Fourth Amendment claims against Police Chief Etheridge and Police Captain Hanger.  As noted above, these claims must be based on their personal involvement; Etheridge and Hanger cannot be liable simply because they supervised the arresting officers.  The only involvement by these individuals was related

30

to the incident involving the injury to Nicholas Jackson when he was hit by a thrown rock. Etheridge's personal involvement was limited to referring Mrs. Jackson to Captain Hanger. That is, as a matter of law, insufficient to support a claim of supervisory liability under § 1983. In <u>Kernats</u>, 35 F.3d 1171, a police supervisor met with plaintiffs several days after a subordinate officer's actions, and he wrote a letter trying to explain and justify those actions. The Seventh Circuit held that any unconstitutional seizure had already occurred by that time, and the supervisor could have done nothing to undo it. This "is not the type of involvement a constitutional violation that gives rise to § 1983 liability." <u>Id.</u> at 1183.

After Etheridge referred Mrs. Jackson to Captain Hanger, Hanger told her that charges against the rock-thrower were not going to be filed and that the matter should be taken up in a civil action in small claims court. The refusal by Hanger (or by the prosecutor for the County) to file criminal charges does not implicate the Jacksons' Fourth Amendment rights at all.

I find that there is no basis for the Plaintiffs' Fourth Amendment claims against Chief Etheridge, Captain Hanger, or Officer McAtee. Because the Plaintiffs have failed to produce evidence of a cognizable Fourth Amendment injury at the hands of the individual defendants, there can be no Fourth Amendment claim against the City. The City of Moline defendants' motion for summary judgment is therefore granted as to the Fourth Amendment claims.

With respect to the Equal Protection claims against the City and its officers, Plaintiffs merge the two claims together, arguing that the racial differences between the Jacksons and their neighbors explain the police officers' decisions in refusing

to charge the rock-thrower, and in filing of charges against Alexandria and Nicholas demonstrate selective enforcement.  Those claims must be evaluated separately.

As the law discussed above makes perfectly clear,  the racial element of the Plaintiffs' argument is wholly immaterial to the selective enforcement claim.  Without consideration of race, Plaintiffs must demonstrate that there was "no rational basis" for those actions or that the conduct of the employees was motivated by a "totally illegitimate animus".  None of the evidence comes close to implying any sort of animus directed at the Plaintiffs by the Defendants, and the evidence is clear that the charges against the Jackson children were based on probable cause, thereby providing the requisite rational basis.

As to the traditional equal protection claim, there is no dispute that the Plaintiffs belong to a suspect class.  Defendants first argue that Plaintiffs have not shown a similarly situated white person who was treated better than they were.  Plaintiffs point to the white rock-thrower who injured Nicholas but was not charged, asserting that he was comparable to Alexandria and Noah, who were charged in later, separate incidents.

The explanation for not charging the rock-thrower was that he was mentally challenged.  This makes the officer's decision not to charge him entirely different than the decisions resulting in charges against Alexandria and Noah, where credibility and the history of the dispute between the Zemos and the Jacksons were the deciding factors.  Because the situations were so different, I find that the rock-thrower is not a similarly situated person.  The failure to point to anyone else dooms the equal protection claim against the Moline defendants.

32

Moreover, even if I were to have found that he was a similarly situated person, I conclude that there is absolutely no evidence of discriminatory intent, which requires more than awareness of consequences. The Plaintiffs have quoted no racist statements by the Defendants; any overt racial misconduct or epithets came from civilians. See Chavez , 251 F.3d at 645. Police department employees treated the Jacksons with respect at all times. The fact that the police were not able to identify perpetrators of the property damage or garner proof of racial harassment falls far short of a demonstration of intent to treat the Jacksons differently because of their race, a conclusion with which the NAACP agreed.

I find the record entirely lacking in the elements necessary to prove an equal protection violation by the Moline defendants. The motion for summary judgment as to those claims is therefore granted.

Finally, with respect to Plaintiffs' claim of conspiracy, I find that their claim of  an agreement between the City, the Officers, and the State's Attorney is wholly unsupported by any admissible evidence. The Plaintiffs speculate that there was an agreement simply because they were unhappy with certain decisions made, but that is neither admissible evidence (being based on something other than personal knowledge) nor sufficient to sustain their claim. The Plaintiffs criticize the procedures used (e.g. not taking notes, the detail included, or not, in police reports) but nowhere do they offer any evidence that such practices had anything to do with a conspiracy or indeed that they are bad practice. It would be wholly speculative to infer a conspiracy from the sparse facts offered by Plaintiffs.

Moreover, the only support for the Plaintiffs' claim that there was a racial purpose for any of the Defendants' actions, individually or cumulatively, is the assertion that these actions were "unlikely to have been undertaken" without an agreement to violate the Jacksons' civil rights. That statement - being an unsupported opinion - falls far short of demonstrating by admissible evidence that there was an agreement that arose out of racial animus. The record clearly demonstrates a reasonable basis, unrelated to race, for each of the actions taken by the police. The Plaintiffs agree that the police responded to every one of their calls and always treated them with respect, facts that belie any racial animus.

I conclude that there is no evidentiary support for two of the requisite elements of a conspiracy claim. The motion for summary judgment based on the conspiracy claim is granted.

## ZEMOS' MOTION FOR SUMMARY JUDGMENT

The only count against the Zemos is stated in Count VI. In that count, Plaintiffs assert that Steve and Rebecca Zemo conspired with Milan Police Captain Beckwith, Sergeant Holt and Officer Ward. The goal of the conspiracy, according to Plaintiffs, was to unlawfully arrest the Jackson children.

"A party may not cry 'conspiracy' and throw himself on the jury's mercy." Gramenos v. Jewel Cos., 797 F.2d 432, 436 (7th Cir. 1986). There must be evidence of the agreement. Id. And the fact that a private person calls the police or persuades the police to make an arrest does not establish a conspiracy. Id.

Moreover, there must be evidence that the private parties have become state actors by virtue of their special relationship with the state actors. Here, no such special

relationship can be inferred from the evidence.  The Zemos' child was frequently in trouble with the very police department which arrested the Jacksons' children.  This fact belies the requisite special relationship.  The Zemos were not state actors for purposes of § 1983.

For the reasons stated above, I find that no conspiracy claim has been stated against the Zemos under either §1983 or §1985.  Other then Steve Zemo's renunciation of the Request to Dismiss, there is no direct evidence of any kind of agreement between the police and the Zemos.  While it might be stated that there was an agreement between the Zemos and someone (who that someone might have been is not shown in the record before this court) that Holt's police reports would be sent to the State's Attorney, that is not the type of "agreement" that supports a conspiracy claim.  There is nothing culpable, at least not without significantly more than is present here, about forwarding a police report to a prosecutor for evaluation.

It would be wholly unreasonable to infer from the Zemos' interactions with the Milan police department and officers that there was a specific agreement to prosecute or to persecute the Jacksons based on their race.  The interactions between the Zemos, the Jacksons, and the police were frequent and mostly unpleasant.  Sometimes charges were filed against one of the Zemos and other times against one of the Jacksons.  The underlying conduct of children of these families was reprehensible - on both sides.  There was foul language, physical violence and intolerance - on both sides.  There was no effective parental involvement; the parents were as bad as the children - on both sides.

That the police officers managed to stay neutral rather than taking sides in this familial dispute is commendable, not culpable.  In no way do the actions of the police support an inference of conspiracy to harm the Jacksons.

The Zemos' motion for summary judgment is granted.

**MILAN DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

There are three counts that involve the Milan Defendants: Count II against the Village; Count V against Chief Baraks; and Count VI against the individual Police Officers.

As noted in the discussion of the claims against the Zemo's there is no evidence sufficient to support any claim of conspiracy between the Milan defendants, the State's Attorney,  and the Zemos.  That evaluation applies equally here.  To the extent that the claims in Count VI against the Milan defendants are based on a conspiracy arising out the of the Request to Dismiss forms, the motion for summary judgment is granted.

Count VI also alleges a claim that the Milan defendants' investigations were "constitutionally deficient."  That is nowhere explained and there is no legal support cited for such a proposition.  In Thompson v. Boggs, 33 F.3d 847 (7th Cir. 1994), the Court addressed a claim that officers had violated plaintiff's right to access to the courts by preparing false police reports or by omitting key facts from police reports that would have formed the basis for a claim of redress.  Id. at 852.  The plaintiff had relied on Bell v. Milwaukee, 746 F.2d 1205 (7th Cir. 1984).  The Boggs Court distinguished Bell, where there was a death involved, and where the falsehoods and omissions had, as a result, prevented the family from realizing that they had a cause of action and from seeking redress.  In Boggs, there had been no death.  The Plaintiff was personally involved in the

underlying incidents, thereby having first-hand knowledge of the events.  The Court's own research has turned up no case where incomplete police reports were found constitutionally deficient absent a death at the hands of police.

In this case, the Plaintiffs were personally present at the events and were able to glean enough information to conclude that they had a cause of action.  Nothing about the police reports prevented them from filing this suit in a timely manner.  To the extent that the claims are based on this theory, the motion for summary judgment is granted.

A similar result is obtained for Plaintiffs' claims that the Milan defendants performed constitutionally deficient investigations.  No case law is cited for the proposition that the constitution imposes substantive standards on police investigations. The only standard imposed by the Fourth Amendment on police investigations is that they be done in good faith.  Once such a good-faith investigation results in sufficient information to establish probable cause, there is no further constitutional requirement to continue searching for more evidence.

In this case, there is nothing about the investigations that suggests bad faith. Relevant persons were interviewed.  No overt racial misconduct or statements were made by anyone associated with the investigations.  Facts - not opinions but facts - were not hidden from the Plaintiffs.

With respect to the claims against the Milan police officers, the Plaintiffs allege that the deficient investigations led the police to arrest Noah falsely.  But at the time Noah was charged with disorderly conduct, the officers had spoken to both Noah and the complaining party as well as a witness.  While the parties may have disputed some of the underlying facts at that time, there was sufficient information to establish probable cause.

The disputes of fact do not dispel that conclusion, nor do they prevent summary judgment on that issue.

At first blush, the timing of the enhanced charges and issuance of the warrant may appear suspicious.  But that suspicion dissipates entirely, because there is absolutely no evidence tying the Milan defendants to those additional charges; they were filed by the State's Attorney based on the police reports that supported the initial charge entered by the officer.  Moreover, since there was probable cause for the initial charge of disorderly conduct, Noah's later arrest on that charge was not in violation of the Fourth Amendment simply because additional charges had been filed in the interim.

And the dismissal of the charges adds nothing to the Plaintiff's claims.  "In our criminal justice system, the Government retains broad discretion as to whom to prosecute."  Wayte v. United States, 470 U.S. 598, 607(1985).  As a result,  procedural or discretionary dismissal of criminal charges prior to prosecution does *not* establish the factual innocence of the charged defendant.  See, Ross v. Duggan , 402 F.3d 575, 585 (6th Cir. 2004).

All in all, the Plaintiffs have failed to produce any evidence of bad faith investigation about the events that led to Noah's arrest, and the record makes it clear that there was probable cause for that arrest.  The motion for summary judgment is allowed.

The claim against Chief of Police Baraks in Count V first alleges that he was part of the conspiracy.  There is no evidence cited for that assertion.  Second, it alleges that he "condoned" the misconduct of his officers.  But the evidence shows no constitutionally cognizable misconduct (or other misconduct for that matter) on the parts of the Milan

officers.  So to the extent that he condoned it, his conduct is not culpable.           Finally, the claim asserts that he was the decision maker for the Village with respect to law enforcement.  Assuming *arguendo* that this is true, it does not establish a claim against Baraks in his individual capacity but rather amounts to a claim against the Village.  An official capacity suit against a municipal official is merely another way of asserting a claim against the municipality.  Lanigan v. Village of East Hazel Crest, 110 F.3d 467, 479 (7th Cir.1997);  Gibson v. City of Chicago, 910 F.2d 1510, 1519 n. 14 (7th Cir.1990);  Rascon v. Hardiman, 803 F.2d 269, 274 (7th Cir.1986).

Arguing that someone is a decision maker is one way of showing that the municipality had a custom, policy or practice.  But where that custom, policy or practice did not lead to any constitutional injury, the custom policy or practice is irrelevant.  These allegations add nothing to Plaintiffs' claims against either Baraks or the Village.

With respect to Plaintiffs' claims against the Village in Count II,  that the Village had a custom, policy or practice of selective enforcement in violation of the Fourth and Fourteenth Amendments, I conclude that the evidence falls far short of being sufficient to withstand summary judgment on that question.  The Plaintiffs are asking that the Court infer from the racial differences between them and the Zemos that the arrests of their children shows such a custom, policy or practice.  Plaintiffs have not only failed to introduce any evidence of any differential treatments of others, they have explicitly denied any knowledge of any such facts.  To infer municipal liability from what is before the court would be to speculate.

Likewise, there is no evidence of conspiracy between Village Officials and the State's Attorney. Obviously there will be interaction between law enforcement officials and prosecutors. That is not a conspiracy and that is all the evidence shows.

## CONCLUSION

For the reasons stated above, the Motion to Strike is granted in part and denied in part. Further, the Motion for Summary Judgment filed by the City of Moline and its officers (#214) is granted; the Motion for Summary Judgment filed by the Village of Milan and its officers (#212) is granted; and the Motion for Summary Judgment filed by the Zemos (#216) is granted. The Clerk is directed to enter judgment in favor of the Defendants and against the Plaintiffs. This case is terminated.

ENTER this 1st day of June 2006.

s/ John A. Gorman

JOHN A. GORMAN
UNITED STATES MAGISTRATE JUDGE